Good morning. The first argued case this morning is number 19-1349, Blacklidge Emulsions against Asphalt Products. Mr. Triggs. Good morning, Your Honor. May it please the Court, my name is John Triggs, along with Ryan Levy and Seth Ogden. We represent Blacklidge Emulsions on the Instant Appeal. The purpose of my opening remarks is simply to set the table. We will show, after we've concluded all of our remarks, that the Board erred in its obvious determination as to both claims. Now there are two sets of claims. There are the settlement claims that have rheology and there are the cure time claims which have rheology. That is a common limitation that appears in all of the claims. And the Board repeatedly ignored the importance of those at rheological value in its analysis. Have they looked at these claims as a whole? The rheological values? Rheological properties, excuse me, Your Honor. And had they done that, they would have found there was no substantial evidence. But where is that in the claim? I mean, I think that one of the things that bothered the Board was that the claim just seemed to state the standard conditions that exist in laying asphalt. Your Honor, well, that's exactly what I was getting to. That's the problem. Those standards are, first of all, for road building. But what is ignored here is that our rheological properties have to do with two critical components in the tack coat as it's cured on the road. And those properties are settlement value and pen value. Where are the distinctions in the claim for the rheological properties? They're spelled out in the claims, Your Honor, that you have to achieve. This is an asphalt competition selected to provide the claimed rheological properties. And those rheological properties are set forth in the patent. There's two rheological properties. There's softening point and penetration. But you're claiming anything that works. Excuse me? You're claiming anything that works without specificity as to product or what's sold. It seemed to me that this is where the Board was having difficulty, as am I. The Board is telling you we didn't tell you how to achieve these results. And I have to stress here, that's what's unique about the patent. Because for decades, it's been what goes in is what counts. And what this patent teaches you is what comes out at the very end, and I mean at the very end, after you've prepared the emulsion, you've stored the emulsion, you've transported the emulsion, and you've applied it, and you've achieved those rheological values. Before we go any further, I just want to make sure I understand. Pasquier, the prior art reference, I didn't see your brief disputing that Pasquier has the pen value and the softening point limitations, right? It's more about the settlement rate and the cure time. Absolutely, Your Honor. Okay, I heard you say something a little different in your opening, so I just wanted to make sure. Sometimes we get tongue tied up here. Right. And so when I read the patent specification, it seems like the contribution that the inventors were allegedly making was the idea of using a hard pen asphalt in making these bonding layers and making these tack coatings. And then it turns out, well, Pasquier was already doing these hard pen asphalt bonding layers, and so then you pivoted to these settlement rates as being the key to the invention. But when I looked at the patent specification, it says really almost nothing about stability as well as cure time. They make little cameo appearances in the midst of this patent specification, but the patent specification is really more about going with a hard pen asphalt, and that was something that was already in the prior art. And so I'm just wondering why in the face of the prior art, in the face of the expert testimony from the petitioner, why wouldn't it just be obvious to optimize whatever kinds of additives you're using so that you do reach these common standards of settlement as well as common standard of a cure time of one hour or less? There's a lot of questions in there. Let me try to take them in order. First of all, when you go to columns 8, 9, and 10, you'll see that we actually say you can also use a soft pen asphalt. The specification teaches. It gives you lots of specific information. It goes into such detail, it tells you who we used as an emulsifier. They give you a name. So to say that we didn't teach you what you needed to know is wrong. Now, I think the next question, if I've got this right, is you're talking to me about the ability to optimize Pasquier. If that's the case, the problem with that is very simple. In order to optimize, you have to have predictability. We know from the test values, unrebutted test values, that not only does this emulsion not have – it has horrible settlement values, but those settlement values are all over the board. You have one that's so bad you can't even test it. It's just settling already and you have them all over the place. So you have a bad emulsion in terms of stability and a bad emulsion in terms of predictability and the case law makes clear that you have to have predictability. The Antoine discloses the settlement rate, right? The claimed settlement rate? No, Your Honor, respectfully. The table doesn't report out settlement rate that falls within the claimed settlement rate? It does, but it's hearsay, Your Honor. It's hearsay of the rankest kind. And what's important about it and what the tests show you is if you somehow thought that Antoine, which uses a standard we don't know anything about, it's internal, it may be good, bad, anything, we don't know. Well, I guess the question is, it's a prior art reference and we're trying to understand whether a skilled artisan would believe there's a reasonable expectation of success in using a prior art hard pen asphalt like Pasquere to get certain kinds of common standard settlement rates. And then if that skilled artisan read Antoine, that seems to be something that would suggest to the mind of the skilled artisan that, okay, Antoine says he can do it and Antoine says he's performed certain tests. So therefore, it stands to reason that we can do a hard pen asphalt like Pasquere with these kinds of settlement rates. All right. I respectfully remind you that I've advanced a hearsay argument with language from, I think it's Wojak, that says the one thing you certainly can't do is use a prior art reference to say it did these tests, it got these results. That's not here. We don't know that in Antoine. Now, the second thing about Antoine that's equally... Well, you're not suggesting that everything in every prior art United States patent is hearsay, are you? Absolutely not. Absolutely not. But when you have a critical fact that you need to prove and you prove it with hearsay, and that's what Wojak says, that's incorrect. And there's a second prong to the Antoine problem, and that is that he is also a sticky asphalt, to keep it simple, and Pasquere is supposed to be a non-sticky asphalt. So those two don't go together. They're not going to help you in any way. And if you did think you had a reasonable expectation of success, you would do precisely the test we did, and you would have seen at that point that I have no reasonable chance of success because I can't even stabilize my emulsion, let alone use it. And remember, this has been, I think, the argument all the way along. Art claims as a whole have a limitation and a rheological set of properties, and they have pure time and rheological properties. And those are always together, and you don't find those two things anywhere in the prior art. You don't find any place in the prior art that would give you a sense that you have a reasonable chance of success in achieving both sets of values, properties rather. What are we supposed to make of the fact that the patent, your patent spec, doesn't really provide any details? Your patent specification just says there's a bunch of ingredients you can throw in, and here are the results that we desire. We want this kind of rheological property. We want this kind of pure time. We want this kind of stability rate. Doesn't that suggest, I mean, you provide some details on how to get the rheological properties, but you provide pretty much zero details when it comes to getting the stability rate. So it makes me wonder why wouldn't these common standard stability rates just be something that's something within the skilled artisan's abilities? To get the stability rates without the rheological properties is to not practice the art. I'm going to keep saying that. That's what's so important. That's my fundamental argument. You may not agree with it, but these claims as a whole continually. Either they be the pure time set, have pure rheology, or the limitation, which is the limitation and the rheology. Also, the other problem is that we do teach you what you need to know, but we're forgetting, somebody put it in this case along the way, having something very specific hobbles you when you're dealing with such difficult emulsions. The genius of this patent is that for decades, everybody said what goes in is what's important. We've told you, no, you can have flexibility. If your asphalt supplier changes, you're not left out in the cold because you've got a formula you have to follow and you followed it with his asphalt. No, you know that whatever ingredients you have that you need that you can find, that you can put together to give you these properties, both of them, both sets of them, you're going to have a trackless tack coat. That's the core of the patent. I understand that it may sound like I'm saying every time there's a prior art hearsay it's not available. No, it's exactly what we did below. We didn't object to the introduction of the document. We only objected to it when they attempted to use the settlement values from an unknown source in terms of what the testing values are. We know it was internal. We don't know what it was. We just don't know much about that at all. You've got to recognize, we stress that what this patent does is tell you where you need to go. You need to arrive. You need to arrive at these particular values in both sets of claims to practice the art. That's the clear message of the patent and it doesn't tie you down to a particular asphalt, to the most far we recommend it. You can do whatever you want and you have to remember, like Mr. O'Leary, these formulators are part science and part art because asphalt is an incredibly difficult thing to deal with. As you know, hard pen asphalt is even harder. For example, when you're dealing with emulsions, one of the things I want to stress, as the Shelby-Tubman handbook says at 67 of the appendix, it's critical, it is virtually impossible to alter one property of an emulsion without altering others. That's why this is such a complex process. That's why, as simple as it sounds... Oh, can I answer this question and then reserve time? It's your time, go ahead. Thank you. Okay, now finish your sentence and then we'll proceed. That's why it's so important to look at this and understand where the patent takes you, which is an end result. You arrive where you need to be and to get there, the formulator, who as I said is a bit scientist and a bit creative, has lots of tools and lots of people are practicing this now to get there, to get to those critical two sets of values. And now I'll stop and reserve the rest of my time. Thank you. Okay, thank you. Mr. Leachman. Good morning, Your Honors. May it please the Court. The original inventive theory set forth in these patents was the purported discovery of the ability to use a hard-pin asphalt to create a trackless tack coat. That was the inventive theory set forth in the patents themselves. That was the inventive theory advanced during prosecution of these patents. It was only in this proceeding when petitioners set forth numerous prior references that had not been considered by the patent office showing that hard-pin asphalt had been used in these types of emulsions. Let's just talk about the merits of this appeal. Yes, ma'am. I believe this is relevant, though, in that it shows that in this proceeding there has been a shift of what is the actual invention from the start. So originally the invention was the use of hard-pin asphalt. Well, they have an adverse decision that they need to respond to. Let's talk about the merits. Yes, ma'am. Pasquet forms the heart of the invalidity challenge that was set forth before the Board. Both Pasquet and the patents at issue disclose the use of hard-pin asphalt in an emulsion to make a trackless tack coat. Both Pasquet and the patents at issue disclose using an emulsifier and stabilizers to provide a storage-stable emulsion that can be used as a trackless tack coat. And lastly, both Pasquet and the Blackledge patents teach that the temperature susceptibility of the actual residual tack coat that's on the road is an important factor for providing that trackless feature. That last point, the fact that Pasquet does indicate in its disclosure that its residual tack coat should not be soft at temperatures below 70 degrees Celsius, is effectively the same exact teaching that the Blackledge patents set forth when they talk about softening point and pin values of the residual tack coat. The reason is because softening point is nothing more than a measurement of an asphalt's consistency at elevated temperatures. What you do when you're testing for a softening point of an asphalt is you're heating the asphalt to the point when it starts to deform. And that gives you the softening point. It tells you when it starts becoming soft at elevated temperatures. So when Pasquet indicates in its specification that the residual tack coat it is creating using its hard-pin asphalt should remain hard at temperatures below 70 degrees Celsius, it is effectively saying the same thing that the Blackledge patents are saying when it's disclosing the end result softening point that one would want to achieve to have the trackless feature. Regarding the correlation between the starting input asphalt that you put into the emulsion and the residual tack coat properties, the Shell-Bittemann handbook, which was advanced in the underlying proceeding, the asphalt manual, and the Gordillo reference, all three indicate that when you make an emulsion the properties that you put into the emulsion, like the asphalt characteristics, are going to show up in the residual tack coat. That's something that all three references say that is typical and expected. That is something that both parties' testing showed. It showed that the pin values of the starting asphalt that was used to make these experimental emulsions also had similar pin and softening point values after the emulsion was cured. Regarding cure time, the Potti reference discloses that its hard-pin asphalt emulsion that was used commercially as a track coat prior to these patents being filed cured within 30 to 60 minutes. And lastly, regarding storage stability, both parties' experts acknowledge that a hard-pin asphalt emulsion could be made storage stable as of 2005. Dr. Alan James, who is the expert for the Petitioner and the Appellee Asphalt Products Unlimited, is one of the foremost experts in asphalt emulsion chemistry. He had worked at AxoNobel for over 30 years. He testified that he himself had made hard-pin asphalt emulsions that were storage stable prior to 2005. We also have numerous references, Rickesons, Potti, Duenos, that reported commercially usable storage stable emulsions in Europe prior to 2005. The notion that a hard-pin asphalt emulsion... Let me start over. The notion that these patents at issue invented the idea that you could create a hard-pin asphalt emulsion that's storage stable is a farce. There's nothing in the disclosure that tells you how to do it, and the reason is, and their own expert says, emulsion formulators already knew how to do it. The enablement of these patents at issue stands on the notion that one already knows how to create a storage stable hard-pin asphalt emulsion. When you compare Pasquet's teachings, which are substantially similar to the patents at issue, it's undisputed that Pasquet could also be enabled, if you're going to accept the principle that these patents are enabled, working on the principle that everyone already knew how to do it. With that, I'll answer any questions you have. Otherwise, I'll yield my time. Any questions? Thank you. Mr. Triggs? Yes, Your Honor. Thank you. I think you just heard Mr. Leishman tell you that according to the Sheldon Timmons handbook, the input equals the output. That's exactly what our patent tells you. We're not teaching you. We're teaching you that the input does not tell you what the output is. You have to arrive at those two sets of properties or you don't practice the art. In terms of optimization, there's a materially limiting step. I'm moving quickly now. A materially limiting step in our patent, which stops the effect, for example, of Southwire. Why? Because we've got those rheological properties. There's three claims, but if you view it that way, the fourth limitation is the rheological properties. We also heard that, as I told you before, the handbook tells you that with emulsions, they're very complicated. And you change one property, it's almost impossible to not change other properties. So this notion of, well, we know what our formula is and that will just come out at the other end, is not it. And that's why no one was able to do a trackless tactical for all those years. They were focusing on what goes in and not what goes out. In terms of the hearsay, I'll give that up, but I'll tell you that I have another reason, respectfully, and that is that Rule 703 of the Federal Rules of Evidence would make this document, whatever it is from Antoine, inadmissible because there's no description of the methodology used. If you remember, he uses an internal test about which we know nothing. So if we don't know the methodology of evidence like this, Rule 703 says it's not admissible, and that's not hearsay because I think I've lost that one, but I'd like to bring that up as well. And one last thought, we taught you that you could use a hard pen and a soft pen, using medium and soft pens so long as you adhere to the achieved tactical rheological properties. And the last thing I'll leave you with, I think, is that you have to understand that once you know about these rheological properties and you know that's critical and that you need to maintain them, as I told you, all the way to the end of the game, when it's put on the road, then once you know those, you can work on limitation values and come to the claims as they've taught you to come. Thank you. I have nothing else. Thank you, Your Honor. Thank you. Thank you both. The case is taken under submission.